**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

JOHN WILLIAMS,          )
                             )
        Plaintiff,         )
                             )
vs.                     )       Case No.  1:19-cv-01228-REB-KLM
                             )
MIDLAND CREDIT MANAGEMENT   )
                             )
        Defendant.      )

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Doc. #46]**

---

Defendant's Motion for Summary Judgment should be denied for six important reasons:

1) The "debt" is subject to the FDCPA because it was a personal debt, not a business debt;

2) Defendant has made judicial admissions that this transaction was a "debt";

3) Midland is a debt collector;

4) Midland violated the FDCPA when attempting to collect this debt from plaintiff;

5) Defendant's "bona fide" error defense fails as a matter of law;

6) Defendant's violations of the FDCPA caused plaintiff actual damages.

RESPONSE TO STATEMENT OF UNDISPUTED FACTS

1. Admit.

2. Admit.

3. Admit

4. Admit.

5. Admit.

6.  Admit.

7.  Admit.

8.  Admit.

9.  Admit.

10. Objection, hearsay – the "skip trace" report is not attached as an exhibit, and is an out of court statement offered to prove the truth of the matter asserted, and is therefore inadmissible.  F.R.E. 802.

11. Objection, hearsay that the address was from the skip trace report – the "skip trace" report is not attached as an exhibit, and is an out of court statement offered to prove the truth of the matter asserted, and is therefore inadmissible.  F.R.E. 802.  It is admitted that on Oct. 24, 2018, Defendant sent Plaintiff a letter seeking to collect the debt at issue.

12. Admit.

13. Admit.

14. Admit.

15. Admit.

16. Admit.

17. Admit.

18. Admit.

19. Denied – Plaintiff was not asked during the call to verify if the address or DOB were his.  **Ex. A**.

20. Admit.

21. Admit.

22. Admit.

23. Admit.

24. Admit.

25. Admit.

26. Admit.

27. Admit.

28. Admit.

29. Admit.

30. Admit.

31. Admit.

32. Admit.

33. Admit.

34. Admit.

35. Admit.

36. Admit.

37. Admit.

38. Admit.

39. Admit.

40. Admit.

41. Admit.

42. Admit.

43. Denied in part – the response does not include the documentation that Plaintiff requested such as a credit application or account statements.  Compare Doc. #46-9 vs. Doc. #46-10.

44. Admit.

45. Disputed as incomplete – in addition to seeking payment, the letter also indicated that a failure to pay could result in the account being sent to an attorney and a lawsuit being filed.  Doc. #46-11.

46. Admit.

47. Admit.

48.  Disputed as incomplete – in addition to seeking payment, the letter was stamped "final notice" and also indicated that a failure to pay could result in the account being sent to an attorney and a lawsuit being filed.  Doc. #46-12.

49.  Admit.

50. Objection – hearsay, F.R.E. 802, and non-disclosure pursuant to F.R.C.P. 26(a)(1) and F.R.C.P. 37(c)(1).  The written policies are out of court statements offered for the truth of the matter asserted, and have never been produced in this case by Defendant, and therefore cannot be used as evidence in this matter.  **Ex. B, p. 3 (failing to identify policies and procedures as a relevant document)**.

51. Objection – hearsay, F.R.E. 802, and non-disclosure pursuant to F.R.C.P. 26(a)(1) and F.R.C.P. 37(c)(1).  The written policies are out of court statements offered for the truth of the matter asserted, and have never been produced in this case by Defendant, and therefore cannot be used as evidence in this matter.  **Ex. B, p. 3 (failing to identify policies and procedures as a relevant document)**.

52. Admit.

53. Admit.

54. Admit.

55. Admit.

56. Admit.

57. Admit.

58. Admit – some of the major consumer reporting agencies have "mixed" the two John Williams' credit files, so some of the Washington John William(s)'s accounts and information appears on Plaintiff's file, even though it does not belong to him.

**ARGUMENT**

**I. The "Debt" Is Subject to the FDCPA Because It Was A Personal Debt, Not A Business Debt**

Contrary to Defendant's assertions that there is "no evidence" that the debt it sought to collect from Plaintiff was a personal debt, as opposed to a business debt, Defendant's own documents produced in this case demonstrate that the credit card it sought to collect from Plaintiff is a consumer debt, and hence governed by the FDCPA. The credit cardholder agreement provides in relevant part:

**ACCOUNT USE**
**Consumer Purposes.** You aren't permitted to use your Account for business purposes. If you do use your Account for business purposes, this Agreement still applies, and you must pay us for those Transactions. You may also have to pay us for any damages and/or expenses resulting from that use. In addition, we may close your Account.

**Ex. C, p. 6**.

The FDCPA was intended to cover personal debts, not business debts.  *Heintz v. Jenkins, 514 U.S. 291, 293, 115 S. Ct. 1489, 1490 (1995), citing 15 U.S.C. § 1692a(5)*. The relevant inquiry is the original purpose of the loan.  *FTC v. Check Inv'rs, Inc.*, 502 F.3d 159, 168 (3d Cir. 2007) (a transaction's status as a "debt" under the FDCPA must be determined at the time that the obligation first arose), *citing Police v. National Tax Funding, L.P.,* 225 F.3d 379, 400 (3d Cir. 2000).  In a similar case, a Plaintiff proved the transaction was a "debt" covered by the FDCPA when he provided a copy of the installment contract which defined the debt as a personal debt.  *Bitah v. Glob. Collection Servs*., 968 F. Supp. 618, 621-22 (D.N.M. 1997) (The contract has two boxes. One says "you intend to use the vehicle primarily for personal, family or household purposes." That box is checked by the parties.  The separate box, for designating the transaction as a "commercial, industrial or agricultural use," is blank).  Here, Plaintiff has also met his burden to show that the transaction is a "debt" as defined in the FDCPA because the cardholder agreement forbids using it for business purposes, and expressly states it is for consumer purposes.  **Ex. C, p. C.**

Further, **Ex. D,** which is a business records affidavit, and 222 pages of credit card statements produced by Citibank for the account demonstrate that that the credit card was used for personal purposes.  By way of example, the statements include the following purchases:  going to the movies (p. 168 of 222), Walmart (id.), buying clothes at Eddie Bauer (id.), Red Lobster (id.), buying goods at the Fort Lewis military commissary (id), Honey Baked Ham (id), jewelry at Kay Jewelers (id), Jersey Mike's submarines (p. 169 of 222), Kentucky Fried Chicken (id), car services at Larson Toyota in Tacoma, WA (id), ice cream at Baskin Robbins (p. 170 of 222), gas at Shell (id),

groceries at Safeway (p.173 of 222), Jimmy Johns sandwiches (id), gym membership at LA Fitness (p. 175 of 222), dental services Alison Polwarth, DDS (p. 178 of 222), Costco (p. 181 of 222), Applebee's (id.), Panera Bread (p.184 of 222), Olive Garden (p. 187 of 222), and McDonalds (id).  Upon review of the 222 pages of statements, not one charge is clearly a business charge, and all charges appear personal in nature such as restaurants, movies, clothes, groceries, dental services, gym memberships, etc.  Thus, Defendant's argument that this card was a business card is not supported by any evidence whatsoever, and is based on pure speculation.  *Dechert v. Cadle Co.,* 2003 WL 23008969 (S.D. Ind. Sept. 11, 2003) (Defendant's pure, inadmissible speculation that the underlying account was not for a consumer purpose was insufficient to rebut Plaintiff's evidence that debt was in fact a consumer account).

Simply put, there are no indications of any kind that this card was a business card.  It was issued in the name of an individual person located at an apartment complex (Apt. F in Lakewood, WA).  Thus, a reasonable jury could easily conclude that this credit card constituted a "debt" as defined in the FDCPA, 15 U.S.C. § 1692a(5). Defendant makes a big deal out of the fact that Plaintiff did not know at his deposition what the other John Williams in Washington bought with his credit card, but Defendant fails to appreciate that Plaintiff need not have personal knowledge of every single fact of the case.  Plaintiff can prove the transaction is a debt through the use of the cardholder agreement and statements.  It is common sense that a party may prove their case through multiple witnesses and documents – there is no rule that a party may only use one witness to prove their case, or that only one witness must have knowledge of each and every fact in the case.

**II. DEFENDANT HAS MADE JUDICIAL ADMISSIONS THAT THIS TRANSACTION WAS A "DEBT."**

On p. 8 of Defendant's MSJ, it says "Midland admits that Plaintiff is a consumer." The FDCPA defines "consumer" as "any natural person obligated or allegedly obligated to pay any **debt**." *15 U.S.C. § 1692a(3).* As a matter of law, one cannot be a consumer unless they are obligated or allegedly obligated to pay any debt. And "debt" is defined in the FDCPA as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment. *15 U.S.C. § 1692a(5).* Thus, by admitting that Plaintiff is a consumer, necessarily Defendant has admitted by operation of law that Plaintiff was allegedly obligated to pay any debt. In order words, you cannot be a "consumer" under the FDCPA unless you are alleged to also owe a "debt" as defined in the FDCPA.

Thus, Defendant's argument that this case must be thrown out because there is no evidence that Midland sought to collect a "debt" must be overruled because Defendant has made judicial admissions to the contrary. *U.S. Energy Corp. v. Nukem, Inc.*, 400 F.3d 822, 833 n.4 (10th Cir. 2005)). ("Judicial admissions are formal, deliberate declarations which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute."); *see also Guidry v. Sheet Metal Workers Int'l Assoc.,* 10 F.3d 700, 716 (10th Cir. 1993) (Statements in briefs "may be considered admissions at the court's discretion.")

8

### III.  MIDLAND IS A DEBT COLLECTOR

Defendant's argument that it is not a "debt collector" under the FDCPA cannot be

taken seriously and is contradicted by Defendant's own website:

**About Midland Credit Management**

Midland Credit Management (MCM) connects with consumers every day to help resolve past-due debts. We specialize in servicing accounts that have fallen behind and have been charged off by the lender. When lenders close these accounts, they often sell them to companies like MCM.

If you've heard from us, your lender has probably charged off one of your accounts and sold it to us. MCM enjoys longstanding relationships with major financial institutions and retailers across the country.

https://www.midlandcredit.com/who-is-mcm/

Moreover, Plaintiff requests that the Court take judicial notice pursuant to F.R.E.

201 that Defendant is a licensed collection agency in the state of Colorado.

https://coag.gov/app/uploads/2020/03/CARReport-2.pdf (p. 122).

Thus, Defendant easily meets the definition of "debt collector" in the FDCPA:

"The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another…"

*15 U.S.C. § 1692a(6).*

Defendant's sister company, Midland Funding, LLC purchased the debt in

question. **Ex. E.**  The letters Defendant sent to Plaintiff made clear that Defendant was

collecting on behalf of its sister company Midland Funding, LLC.  Doc. #46-7, p.1.

Midland's representatives called Plaintiff and his wife from India, and sent letters to

Plaintiff from California to Colorado, which certainly qualifies as using the mails or

instrumentalities of interstate commerce to collect debts for its sister company, Midland

Funding, LLC.  Defendant clearly meets the definition of "debt collector."

**IV. Midland violated the FDCPA when attempting to collect this debt from Plaintiff**

The FDCPA prohibits the following conduct:

> "Communicating or **threatening** to communicate to any person credit information
> which is known or which should be known to be false, including the failure to
> communicate that a disputed debt is disputed."

*15 U.S.C. § 1692e(8).*

During the Nov. 13, 2018 phone call, Plaintiff made clear to Defendant's

representative that the account was not his.  **Ex. A, 1:01-1:52**.  Defendant continued to

persist in collecting the debt by saying "How can we get this resolved today?."  *Id, 1:17.*

Plaintiff then responded by saying that he had just checked his credit report and there

was no debt on there from this company.  *Id. 2:19*.  Defendant's representative then

said "…**It is not on your bureaus yet, but it is going to be there in the future**…"  *Id.*

*2:37.*

Threatening to report a debt on Plaintiff's credit report, when in fact, the debt was

owed by a different John Williams is a threat to report false information about Plaintiff,

and therefore violates 15 U.S.C. 1692e(8), and certainly could be viewed by a

reasonable jury as generally unfair and deceptive pursuant to 15 U.S.C. § 1692e &

1692f.

Moreover, during the Nov. 13, 2018 call, the Midland representative falsely told

Plaintiff "John, I am talking about a person who was born on 19th of September, 1956,

and the mailing address that we have that is 10146 Cook Street."  **Ex. A, 02:04**.  This

was deceptive because the real mailing address that Defendant had on file was not

Plaintiff's Colorado address, but was actually the Lakewood, WA address for the other John Williams.  **Ex. E**.  This false statement did in fact deceive Plaintiff because Plaintiff responded that he believed he was an identity theft victim.  **Ex. A, 02:19**.  A reasonable jury could view this false statement as generally unfair and deceptive pursuant to 15 U.S.C. § 1692e & 1692f because it was obviously intended to make Plaintiff believe that because Midland had his address, that it must have been his debt.

Moreover, Defendant's letters to Plaintiff attempting to collect the debt from Plaintiff instead of the actual John Williams that owes the money could certainly be viewed by a reasonable jury as generally unfair and deceptive pursuant to 15 U.S.C. § 1692e & 1692f.

Particularly egregious were the letters Defendant sent Plaintiff threatening to sue him for the other John Williams' debt.  *See e.g. Doc. #46-8* (which was sent almost 4 months after Plaintiff told Defendant in the Nov. 13, 2018 phone call the debt was not his); *Doc. #46-11* (which was sent almost 5 months after Plaintiff told Defendant in the Nov. 13, 2018 phone call the debt was not his); *Doc. #46-12* (which was sent almost 6 months after Plaintiff told Defendant in the Nov. 13, 2018 phone call the debt was not his).   If knowingly or recklessly threatening to sue the wrong person for someone else's debt does not qualify as unfair or deceptive, or otherwise violate the FDCPA, it is hard to imagine conduct that would.

Perhaps, most important is that Citibank provided Midland Funding the last known address for John Williams as 2614 84TH STREET CT S, Apt F, Lakewood, WA 98499.  **Ex. E**.  There is no reasonable basis for Defendant to begin sending letters threatening to sue a Colorado resident who happens to share the same name as the

11

actual debtor, particularly when Defendant had already confirmed in the Nov. 13, 2018 phone call that it was pursuing the wrong John Williams, and again Defendant confirmed on Feb. 8, 2019 when it called Plaintiff's wife that it was pursuing the wrong person.  **Ex. F**.  Defendant attempts to blame this on a hearsay "skip trace" report that it purchased, but Defendant does not even bother to attach the skip trace report as an exhibit, or even identify the source of the information.  Nevertheless, skip trace reports often come with disclaimers of accuracy, as described by Lexis Nexis, the industry leader in the sale of skip trace reports:

> *Due to the nature of the origin of public record information, the public records and commercially available data sources used in reports may contain errors. Source data is sometimes reported or entered inaccurately, processed poorly or incorrectly, and is generally not free from defect. This product or service aggregates and reports data, as provided by the public records and commercially available data sources, and is not the source of the data, nor is it a comprehensive compilation of the data. <u>Before relying on any data, it should be independently verified.</u>*

https://risk.lexisnexis.com/products/accurint-for-collections---contact-and-locate-workflow

## V. Defendant's "Bona Fide" Error Defense Fails as a Matter of Law

The bona fide error defense is an affirmative defense to an FDCPA case, which requires proof of three elements:

1) Defendant must admit to violating the FDCPA;

2) The violation was unintentional;

3) Defendant must prove that the violation occurred in spite of maintaining reasonable procedures reasonably adapted to avoid any such error.

*15 U.S.C. 1692k(c); see also Johnson v. Riddle*, 443 F.3d 723, 727 (10th Cir. 2006).

Defendant fails on all three elements.  First, the declaration signed by Defendant's representative does not allege that it violated the FDCPA, or claim that any

such violation was unintentional. *Doc. # 46-1.* Defendant extensively argues in the Motion for Summary Judgment that it did not violate the FDCPA – the "bona fide" error defense only applies if the Defendant violated the FDCPA. Defendant wholly fails to inform the Court which sections of the FDCPA it violated, nor does Defendant supply any evidence in the record that such a violation was unintentional. The Court does not even need to get into whether Defendant's policies are reasonable because Defendant has not even met the first two elements of the bona fide error defense.

As a preliminary matter with respect to whether Defendant has reasonable procedures in place to prevent these types of violations, Defendant cannot rely on its written policies and procedures because they were never identified or produced in Defendant's F.R.C.P. 26(a)(1) disclosures or in discovery in this case. **Ex. B, p.3.** There is no question that the policies are in writing because the declaration states that the witness has "reviewed" the policies. *Doc. #46-1, ¶ 38.* The consequences of this non-disclosure are that Defendant cannot use the policies as evidence. F.R.C.P. 37(c)(1). Defendant's attempts to cure this defect by inserting a few sections of the undisclosed policies into a declaration for its corporate witness to sign fails because it is hearsay, and is still a form of non-disclosure because Plaintiff's counsel is then unable to verify the policies and point out other discrepancies with the policies.

Substantively, the Defendant's policies are not reasonable in any event. First, Defendant does not even identify any policy at all to prevent the following violations: (1) the threat to report the other John Williams' debt on Plaintiff's credit report during the Nov. 13, 2018 phone call; (2) falsely telling Plaintiff that the address on file was Plaintiff's Colorado address, when in reality, the address on file was a Washington

address; and (3) the letters Defendant sent to Plaintiff threatening to sue him for the other John Williams' debt. In fact, Defendant does not identify any policies designed to prevent collecting a debt from the wrong person generally, which is a huge risk in Defendant's business, especially when dealing with common names such as "John Williams" or "John Smith" or "Robert Smith" or "James Johnson", etc.   This is especially true when one sees the very limited information that Midland gets when it purchases these debts for pennies on the dollar – it essentially consists of a one-page document with some basic information about the consumer.  **Ex. E.**

Defendant's sole policy on this issue ostensibly is that if it calls the wrong party – it notes its file not to call that number again.  But the deficiency in that policy is that Defendant does not also block the address <u>associated</u> with the phone number of the wrong party.  Defendant learned it was collecting from the wrong party when it called Plaintiff on Nov. 13, 2018, and again on Feb. 8, 2019 when Defendant called Plaintiff's wife.  **Ex. F, at 00:09 – 1:18**.  At the conclusion of these phone calls, Defendant blocked the phone numbers, but did not take the next step and block the <u>address</u> associated with those phone numbers.  In other words, Citibank gave Defendant a Washington phone number and Washington address for John Williams.  Defendant then somehow found a Colorado phone number and address for a John Williams in Colorado. Defendant called the Colorado number, learned it was the wrong John Williams, and yet decided to send letters to the Colorado address anyway threatening to sue Plaintiff. Accordingly, Defendant's "bona fide" error defense either fails as a matter of law, or at a minimum, should be a jury question.  *McDaniel v. S. & Assocs., P.C.*, 325 F. Supp. 2d

14

1210, 1219 (D. Kan. 2004) (whether the bona fide error defense applies is a question of fact for the jury).

In any event, these scant policies cannot be said to be so reasonable as a matter of law that Plaintiff loses his 7th Amendment right to a jury trial under the U.S. Constitution.  Indeed, one court found the bona fide error defense not to have been met due to the utter absence in the record of any manuals, memos, or training materials on FDCPA compliance.  *Smith v. Am. Revenue Corp.*, No. 2:04-CV-00199-PRC, 2005 WL 1162906  at *29 (N.D. Ind. May 16, 2005).  This court should follow *Smith* and find that Defendant has not met its burden to show reasonable policies, when there are no policies, memos, or FDCPA compliance training materials in the record.

## VI. Defendant's Violations of the FDCPA Caused Plaintiff Actual Damages

With respect to actual damages, the 10th circuit has held:

> "An injured person's testimony *alone* may suffice to establish damages for emotional distress provided that she reasonably and sufficiently explains the circumstances surrounding the injury and does not rely on mere conclusory statements."

*Llewellyn v. Allstate Home Loans, Inc.,* 711 F.3d 1173, 1183 (10th Cir. 2013).

Although Defendant points to other stressful events in Plaintiff's life such as cancer treatments, getting laid off, and his father passing away, the 10th circuit rejected this very argument.  *Id (*Plaintiff's claims of emotional distress no less reasonable simply because he had other stressful events in life such as multiple foreclosures and diabetes).  In other words, Plaintiff is allowed to be a human being and still have rights under the FDCPA – contrary to Defendant's assertions, one does not lose their rights under the FDCPA because they were diagnosed with cancer, or because they lost their

job or because a family member passed away.  There is no requirement that Plaintiff have a perfect life, other than being harassed for a debt that is not his, in order to get access to justice.

Plaintiff experienced a host of emotional distress caused by Defendant.  Plaintiff has attached an affidavit describing in detail about how he was worried that Midland would destroy his credit, sue him for a debt he did not owe, and that he would lose his house, or have to pay for a debt he didn't owe or even file bankruptcy.  **Ex. G.**  In his deposition, Plaintiff described being notified by Defendant that they were going to sue him as feeling like "I was hit with a load of bricks" and it felt almost identical to when "I was called by the doctor and told that I had cancer."  *Doc. #46-13, p.22:18-25.*

It is well established that actual damages under the FDCPA include emotional distress.  *See e.g. Santacruz v. Standley & Assocs., LLC,* Civil Action No. 10-cv-00623-CMA-CBS, 2011 WL 3366428, at *2 (D. Colo. Aug. 4, 2011) (jury award of $29,300 in emotional distress).  Indeed, this issue was extensively briefed in *Santacruz*, and Judge Arguello properly ruled that "It is well settled that the FDCPA allows recovery of actual damages for personal humiliation, embarrassment, mental anguish, or emotional distress. *Santacruz v. Standley & Assocs., LLC*, Civil Action No. 10-cv-00623-CMA-CBS, 2011 WL 1043338, at *16-17 (D. Colo. Mar. 17, 2011) (citations omitted).  Judge Arguello was also correct when she held that "… Plaintiff may rely on her own testimony to establish emotional distress damages, provided that it is sufficiently detailed and does not rely on conclusory statements. *Id *19* (citations omitted).  In this case, Plaintiff has done precisely that, and has provided a detailed description of his emotional distress.  **Ex. G.**  Here, a reasonable jury could conclude that Defendant caused

Plaintiff actual damages, and it should be up to the jury to decide the proper amount to award.

WHEREFORE, Plaintiff prays that the Motion for Summary Judgment be denied, and that this matter be set for a jury trial as soon as possible.

Respectfully submitted this 6th day of May 2020.

s/ Matthew R. Osborne
11178 Huron St., Ste 7
Northglenn, CO 80234
(303) 759-7018
matt@mrosbornelawpc.com

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on 5/6/2020, I served a true and correct copy of the Plaintiff's Response to Defendant's Motion for Summary Judgment via CM/ECF to:

Jamie Cotter, attorney for Defendant

s/ Mike Nobel